# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# SOUTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | |
| Plaintiff, | |
| v. | No. 15-03076-04-CR-S-RK |
| **JOSEPH M. ROAT**, | |
| Defendant. | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION TO REDUCE SENTENCE
PURSUANT 18 U.S.C. §3582(c)(1)(A)(i) – COMPASSIONATE RELEASE**

The United States of America, through Timothy A. Garrison, United States Attorney for the Western District of Missouri, and the undersigned attorney, provides the following response in opposition to the defendant's motion for compassionate release. The defendant seeks to have his 72-month sentence for conspiracy to distribute 100 grams or more of a mixture or substance containing a detectable amount of heroin reduced to time served based upon extraordinary and compelling reasons. The defendant argues extraordinary and compelling reasons exist because the coronavirus (COVID-19) places him at risk if the defendant remains in the custody of the Bureau of Prisons (BOP). (D.E. 375.) Because the defendant has not demonstrated extraordinary and compelling reasons justifying a reduction and remains a danger to the community, the Government opposes the request and asks the Court to deny the defendant's motion.

### I. Procedural History

On September 30, 2015, the defendant was charged in a 13-count superseding indictment with: conspiracy to distribute 100 grams or more of a mixture or substance containing a detectable amount of heroin, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and 846; distribution of a

mixture or substance containing a detectable amount of heroin, in violation 21 U.S.C. § 841(a)(1) and (b)(1)(C); and possession, with intent to distribute, a mixture or substance, containing a detectable amount of heroin, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). (D.E. 91.)

On February 5, 2016, pursuant to a written plea agreement, the defendant pleaded guilty to Count One of the Superseding Indictment, charging him under 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and 846 with conspiracy to distribute 100 grams or more of a mixture or substance containing a detectable amount of heroin. (D.E. 167.) On October 7, 2016, the Court departed downward and sentenced the defendant to a term of 72 months' imprisonment in the Bureau of Prisons, to be followed by a five-year term of supervised release. (D.E 269.)

On May 4, 2020, the defendant filed a *pro se* motion for appointment of counsel to assist him in filing a motion for release to home confinement. (D.E. 366.) The Government filed its suggestions in opposition on May 18, 2020. (D.E. 367.) The Court ordered the defendant to reply by June 1, 2020. (D.E. 367.) The defendant filed no such reply. On May 18, 2020, the defendant made a request for compassionate release to the Warden at the Federal Correctional Institution located in Forrest City, Arkansas. (D.E. 375.) On May 28, 2020, the defendant filed a *pro se* motion for compassionate release. (D.E. 368.) On June 25, 2020, through counsel, the defendant filed a supplement to the defendant's original *pro se* motion and re-asserted that the current situation regarding the coronavirus (COVID-19) places the defendant at risk if he remains in custody. (D.E. 375.)

Based on the information made available on the Bureau of Prisons Inmate Locator, the defendant is currently housed at the Federal Correctional Institution located in Forrest City, Arkansas, and his expected release date is December 4, 2020. (*See* https://www.bop.gov/inmateloc/.)

**II. First Step Act**

The First Step Act, effective December 21, 2018, provides inmates the ability to file a motion for compassionate release, an ability previously only vested in the United States Bureau of Prisons (BOP). Under 18 U.S.C. § 3582(c), a court may not modify a term of imprisonment once it has been imposed except that, under subsection § 3582(c)(1)(A), a court may reduce a term of imprisonment upon finding "extraordinary and compelling reasons," if such reduction is consistent with applicable policy statements of the Sentencing Commission, after considering the factors set forth in 18 U.S.C. § 3553(a), and after determining the defendant is not a danger to the community as provided in 18 U.S.C. § 3142(g). (U.S.S.G. § 1B1.13(2).). The pertinent policy statement, U.S.S.G. § 1B1.13, defines specific medical, age, and family circumstances as possibly justifying a sentencing reduction under this statute, and further authorizes a sentencing reduction based on an extraordinary and compelling circumstance identified by the BOP. (§1B1.13 Commentary n.1(D).)

The statute, 18 U.S.C. § 3582(c)(1)(A), originally permitted judicial relief only upon a motion by the Director of the BOP. Section 603(b) of the First Step Act now permits courts to act "upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."

As the proponent of a motion, the inmate bears the burden of proving both that they have satisfied the procedural prerequisites for judicial review—*i.e.*, that they have "exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on [his] behalf" or that 30 days have lapsed "from the receipt of such a request by the warden"—and that "extraordinary and

3

Case 6:15-cr-03076-RK   Document 376   Filed 07/09/20   Page 3 of 16

compelling reasons" exist to support the motion. 18 U.S.C. § 3582(c)(1)(A); *see United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue."); *cf. United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013) ("[A] defendant, as the § 3582(c)(2) movant, bears the burden of establishing that a retroactive amendment has actually lowered his guidelines range in his case.").

### III. BOP Response to the Coronavirus Pandemic

The BOP has taken significant measures to protect the health of all inmates. The BOP began planning for potential coronavirus transmissions in January 2020. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control (CDC), including by reviewing guidance from the World Health Organization (WHO). On March 13, 2020, the BOP announced that it was implementing the Coronavirus (COVID 19) Phase II Action Plan in order to minimize the risk of COVID-19 transmission into and inside its facilities. The Action Plan comprises many preventive and mitigation measures, including the following:

- **Screening of Inmates and Staff:** All new BOP inmates are screened for COVID-19 symptoms and risk of exposure. Asymptomatic inmates with a documented risk of exposure will be quarantined; symptomatic inmates with documented risk of exposure will be isolated and tested pursuant to local health authority protocols. In areas with sustained community transmission, all facility staff will be screened for self-reported risk factors and elevated temperatures. (Staff registering a temperature of 100.4 degrees F or higher will be barred from the facility).

- **Quarantine Logistics:** All BOP institutions establish quarantine areas within their facilities to house any inmates found to be infected with or at heightened risk of being infected with coronavirus pursuant to the above-described screening protocol.

- **Suspension of Social Visits and Tours:** The BOP placed a 30-day hold on all social visits and tours.

4

- **Suspension of Legal Visits:** The BOP placed a 30-day hold on legal visits, with exceptions permitted on a case-by-case basis.

- **Suspension of Inmate Movements:** The BOP ceased the movement of inmates amongst its facilities for at least 30 days, with exceptions for medical treatment and other exigencies.

- **Modified Operations:** BOP facilities modified operations in order to maximize social distancing.

On March 18, 2020, the BOP implemented Phase III of the Action Plan maximizing telework for locations that perform administrative services. All cleaning, sanitation, and medical supplies were inventoried, and sufficient supplies were on hand and ready to be distributed to facilities as necessary. The BOP placed additional orders for supplies, in case of a protracted event. *See* https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_update.pdf (phases I-III).

Phase IV of the Action Plan was implemented on March 26, 2020. The BOP revised and updated its quarantine and isolation procedures to require all newly admitted inmates, whether in a sustained community transition area or not, be assessed using a screening tool and temperature check. Asymptomatic inmates are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation.

On April 1, 2020, in response to a growing number of quarantine and isolation cases, the BOP implemented Phase V and directed the following actions be taken immediately to further mitigate the exposure and spread of COVID-19:

- For a 14-day period, inmates in every institution be secured in their cells/quarters to decrease the spread of the virus.

- During this time, to the extent practicable, inmates should still have access to programs and services that are offered under normal operating procedures, such as mental health treatment and education.

- The BOP is to coordinate with the United States Marshals Service to significantly decrease incoming movement during this time.

- After 14 days, this decision will be reevaluated.

- Limited group gathering will be afforded to the extent practical to facilitate, commissary, laundry, showers, telephone, and Trust Fund Limited Inmate Computer System (TRULINCS) access.

*See* https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp (phases IV-V).

Phase VI, implemented on April 13, 2020, extended all Phase V measures until May 18, 2020. https://www.bop.gov/resources/news/pdfs/20200414_press_release_action_plan_6.pdf. On April 23, 2020, and again on May, 7, 2020, the BOP announced they had substantially expanded their ability to test inmates for COVID-19 by using Abbott ID NOW instruments for Rapid RNA testing. https://www.bop.gov/resources/news/pdfs/20200423_press_release_covid19_testing.pdf; https://www.bop.gov/resources/news/pdfs/20200507_press_release_expanding_rapid_testing.pdf Phase VII, announced on May 18, 2020, extended all measures from Phase VI, and will remain in place through June 30, 2020, at which time the plan will be evaluated. https://www.bop.gov/resources/news/20200520_covid-19_phase_seven.jsp. Further details regarding the BOP's COVID-19 action plan and efforts are available at https://www.bop.gov/resources/news/20200313_covid-19.jsp and at a daily updated resource page: https://www.bop.gov/coronavirus/index.jsp.[1]

Taken together, these measures are designed to sharply mitigate the risks of COVID-19 transmission in a BOP institution. BOP professionals continue to monitor this situation and adjust

---

[1] According to the resource page, due to the rapidly evolving nature of this public health crisis, the BOP will update the dashboard daily at 3:00 p.m. based on the most recently available data from across the agency as reported by the BOP's Office of Occupational Health and Safety.

practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately, inmates have nevertheless become ill, and more likely will in the weeks ahead. But the solution is not to exclude BOP from reviewing applications for compassionate release. There are many challenging factors to consider during this pandemic, and the BOP should have the opportunity to assess those factors during the statutorily required review period. For example, notwithstanding the current pandemic crisis, the BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider a myriad of other factors, including the availability of transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced, if any, service), and of supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, the BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2),

and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Further, Section 12003(b)(2) of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), enacted on March 27, 2020, permits the BOP, if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau of Prisons, to "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate." Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note.) On April 3, 2020, the Attorney General gave the Director of the BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidents of coronavirus transmission.

Even though the Government has asked the Court to dismiss the defendant's motion, the Government is sensitive to the issues the defendant raises related to the coronavirus pandemic. The Government does not minimize the concern or the risk to inmates such as the defendant. At the present time, the BOP has taken aggressive action to mitigate the danger for all inmates.

In this case, although the defendant expresses concern for his health related to the coronavirus pandemic, the defendant does not allege he is in a category due to age or preexisting medical condition that places him in a high-risk category that would establish an extraordinary or compelling reason for a sentence reduction.

### IV. The Defendant has Not Identified Extraordinary and Compelling Reasons

The Sentencing Commission's pertinent policy statement related to extraordinary or compelling reasons appears at U.S.S.G. § 1B1.13. As amended November 1, 2018, the statement repeats the text of 18 U.S.C. § 3582(c)(1)(A) and adds that the Court should reduce the sentence

only if the "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."

The BOP promulgated Program Statement 5050.50, amended effective January 17, 2019, to set forth its own internal criteria for evaluating compassionate release requests. Courts have frequently upheld the BOP's discretionary authority in its management duties over federal prisoners. *See Tapia v. United States*, 564 U.S. 319, 331 (2011) ("When a court sentences a federal offender, the BOP has plenary control, subject to statutory constraints, over [the place of imprisonment and treatment programs].").

The application notes for U.S.S.G. § 1B1.13 define medical condition of the defendant as:

Medical Condition of the Defendant.--

    (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

    (ii) The defendant is--

      (I) suffering from a serious physical or medical condition,

      (II) suffering from a serious functional or cognitive impairment, or

      (III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(U.S.S.G. § 1B1.13 Application Note 1(A).)

In this case, the defendant claims that he suffers from anemia, hepatitis C, and pre-diabetes and those conditions increase his risk of illness from COVID-19. (D.E. 375.) The defendant has made an inadequate showing of extraordinary and compelling circumstances. There is no evidence

9

or claim that he is unable to provide self-care or perform daily living activities. The defendant has failed to sustain his burden to prove that he meets the requirements for compassionate release or a reduction of sentence. The defendant does not have a terminal illness/suffer from any physical or mental condition that substantially diminishes his ability to provide self-care within the correctional facility, etc. There are no extraordinary and compelling reasons, as those terms are defined for the purpose of 18 U.S.C. § 3582(c)(1)(A), justifying compassionate release or any form of sentence reduction in this case.

The defendant argues his medical condition places the defendant at an increased risk should the defendant contract the coronavirus. (D.E. 375.) Unfortunately, the defendant's circumstance is not extraordinary in the context that many individuals across the nation are in the same or similar position as the defendant, and the defendant's medical condition remains the same whether he is released. While the Government is attuned to the difficulties facing inmates, this particular instance simply fails to meet the requirements of the law and policy. In *Dillon v. United States*, 560 U.S. 817, 826, (2010) the Supreme Court determined that the sentencing court could only consider a reduction in sentencing if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission. Based on that reasoning, U.S.S.G. § 1B1.13 Application Note 1(A) is mandatory and the defendant's request does not meet the requirements for release.

The application notes for U.S.S.G. § 1B1.13 define family circumstances as:

Family Circumstances.**--**

(i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.

(ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(U.S.S.G. § 1B1.13 Application Note 1(C).)

10

Case 6:15-cr-03076-RK   Document 376   Filed 07/09/20   Page 10 of 16

In this instance, the defendant's family circumstances, that is, the need to help care for his son, does not meet the criteria for the existence of a family circumstance as set forth in the Commission's policy statement. Currently, the defendant's mother is caring for the defendant's son. (D.E. 375.) The defendant makes no claim that his mother is incapacitated, only that there would be a benefit to her if he were released. (D.E. 375.) This particular instance simply fails to meet the requirements of the law and policy. In *Dillon v. United States*, 560 U.S. 817, 826, (2010) the Supreme Court determined that the sentencing court could only consider a reduction in sentencing if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission. Based on that reasoning, U.S.S.G. § 1B1.13 Application Note 1(C) is mandatory, and the defendant's request does not meet the requirements for release.

V. **The Court Has No Authority to Place the Defendant on Home Confinement**

The defendant asks the Court to resentence him to home confinement for the remaining five months of his custodial sentence. (D.E. 368.) The Court should decline the request because read in conjunction, 18 U.S.C. §§3621(b) and 3624(c) impose upon the BOP a qualified obligation to facilitate a prisoners' transition from incarceration in a prison facility to a halfway house. (*See Elwood v. Jeter*, 386 F.3d 842, 844, 847 (8th Cir. 2004).) "There is no question that § 3621(b) provides the BOP with broad discretion to choose the location of an inmate's imprisonment." *Fults v. Sanders*, 442 F.3d 1088, 1090 (8th Cir. 2006). In a case originating from the Western District of Missouri, in a concurring opinion, Judge Bright opined that the Second Chance Act of 2007 marked "an increasing special obligation to help federal offenders successfully reenter into society." *United States v. Wessels*, 539 F.3d 913, 915 (8th Cir. 2008) (Bright, J., concurring) (citing Pub. L. No. 110-199, 122 Stat. 657 (Apr. 9, 2008).) The First Step Act, under which the defendant is seeking release, further expanded the BOP's authority to place prisoners, providing more ways

to reach rehabilitation goals, but it did not change a district court's authority to place an inmate, and does not provide authority for the Court to order placement in a halfway house or order home confinement.

On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons to prioritize the use of statutory authority to place prisoners in home confinement. The CARES Act, passed on March 27, 2020, temporarily expanded this provision, while leaving its application to the BOP. As part of the CARES Act, Congress sought to address the spread of the coronavirus in prison by permitting the BOP to expand the use of home confinement under § 3624(c)(2). Section 12003(b)(2) of the CARES Act suspends, during the emergency of the coronavirus pandemic, the limitation in § 3624(c)(2) that restricts home confinement to the shorter of 10 percent of the inmate's sentence or six months, once the Attorney General makes requisite finding that emergency conditions will materially affect the function of BOP.[2] The Attorney General made those findings on April 3, 2020, conferring on BOP the authority to expand its use of home confinement, and the BOP is devoting all available resources to executing that directive.

As set out above, and pursuant to 18 U.S.C. § 3642(c)(2), the BOP has exclusive authority to determine the placement of prisoners. Although the First Step Act, CARES Act, and Second Chance Act give eligible inmates the possibility to be considered for home confinement or halfway house placement, that decision rests with the BOP. *See United States v. Kluge*, 2020 WL 209287 at *3 (D. Minn. Jan 14, 2020) ("Nothing in the statutes amended by the FSA permits the Court to

---

[2] Section 12003(b)(2) provides that "if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau, the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate."

12

place Defendant in home confinement. Under the FSA, the authority to place a prisoner remains with the BOP."); *United States v. James*, 2020 WL 1922568 *3 (D. Minn. April 21, 2020) (holding the district court "lacks jurisdiction to grant [defendant's] motion under the First Step Act, Second Chance Act, or CARES Act.")

Since March 26, 2020, the BOP has assessed and placed a significant number of inmates on home confinement (*see* https://www.bop.gov/coronavirus/index.jsp), focusing on, among other factors, the vulnerability of the inmates, the prisons most at risk, and the dangers posed by the inmates if released. The BOP is in the best position to determine who should be placed on home confinement, and has greatly expanded this option for suitable inmates during this time of crisis.

Here, because the defendant does not present an extraordinary and compelling reason that justifies a reduction of his sentence, the Court should not reconsider the terms of his sentence. Regardless of the Court's determination on compassionate release, the authority to determine the defendant's placement for the remainder of his sentence rests squarely with the BOP.

## VI. Defendant Remains a Danger to the Community

This Court may not reduce the defendant's sentence unless it finds that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13. This defendant is a danger to the community, and should not be considered for compassionate release.

Under 18 U.S.C. § 3142(g), the Court must consider four factors in determining whether the defendant might present a danger: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record

13

concerning appearance at court, and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g)(1)–(4). Consideration of these factors—which are not affected by COVID-19—does not allow this Court to conclude that this defendant is not a danger to the safety of any other person or the community.

In this case, the defendant was conservatively accountable for the distribution of approximately 11 kilograms of heroin in the Springfield, Missouri, area. (PSR 7, ¶ 24.) The defendant both personally distributed heroin and supplied the drug trafficking organization by transporting heroin from Chicago, Illinois. (PSR 4-6, ¶¶ 11, 13, 15, 16, 18.)

In addition, the defendant possessed and distributed firearms during the course of this conspiracy. (PSR 5-6, ¶¶ 12-13, 17.) On one occasion, the defendant sold heroin, a semi-automatic assault rifle, and three high-capacity magazines. (PSR 5, ¶ 13.) The defendant boasted that the rounds contained in the magazine were "armor piercing." (PSR 5, ¶ 13.) Finally, the defendant's drug activity included the distribution of substantial amounts of methamphetamine. (PSR 5-6, ¶ 14.) The defendant sold pound-quantities of methamphetamine for $18,500 per pound. (PSR 5-6, ¶ 14.)

Although the defendant does not have many convictions, his contact with law enforcement has been consistent throughout his adult life, which culminated in his conviction for possessing a controlled substance, to which he was sentenced to a five-year term of probation. (PSR 9-10, ¶¶ 42-46).

While on probation, the defendant failed to complete substance abuse treatment twice, tested positive for opiates twice, incurred a new law violation, failed to submit a urine specimen, and absconded from supervision. (PSR 9-10, ¶ 46.) It should be noted that the defendant's involvement in this case occurred while on this term of probation. (PSR 9-10, ¶ 46.)

Nothing about the COVID-19 pandemic reduces the defendant's danger to others.

The defendant has failed to demonstrate that the § 3142(g) factors the Court considered at the time of detention or the § 3553(a) factors the Court considered at the time of sentencing have changed, therefore, the Court should deny the defendant's motion for immediate release.

### VII. Record of Rehabilitation is Not an Extraordinary and Compelling Reason

Finally, the defendant asserts he has demonstrated a record of rehabilitation, and the Government does not dispute that the accomplishments the defendant has made in prison, as listed and documented in his motion (D.E. 375), are laudable. However, rehabilitation of a defendant is not, by itself, an extraordinary and compelling reason for a reduction of a term of imprisonment. (U.S.S.G. § 1B1.13 Commentary n.3; 28 U.S.C. § 944(t).)

### CONCLUSION

Based on the foregoing, the Government respectfully requests that the defendant's motion for compassionate release be denied.

Respectfully submitted this 9th day of July, 2020.

Timothy A. Garrison
United States Attorney

*/s/ Nhan D. Nguyen*
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

  The undersigned hereby certifies that a copy of the foregoing was delivered on July 9, 2020, to the CM-ECF system of the United States District Court for the Western District of Missouri for electronic delivery to all counsel of record and defendant at:

    Joseph M. Roat
    Reg. No. 27951-045
    FCI Forrest City Low
    Federal Correctional Institution
    P.O. Box 9000
    Forrest City, Arkansas 72336

    */s/Nhan D. Nguyen*
    Assistant United States Attorney